JDN

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Daniel McReaken, | No. CV 09-0327-PHX-DGC (MHB) |
| Plaintiff, | **ORDER** |
| vs. | |
| Dora B. Schriro, et al., | |
| Defendants. | |

Plaintiff John Daniel McReaken brought this civil rights action under 42 U.S.C. § 1983 against various Arizona Department of Corrections (ADC) officials (Doc. 1). Before the Court are Defendants' Motion for Summary Judgment (Doc. 44) and Plaintiff's Motion for Order to Transfer Retention Funds (Doc. 47). The Court will grant Defendants' motion, deny Plaintiff's motion as moot, and terminate the action.

**I.    Background**

Plaintiff's claim arose during his confinement at the Arizona State Prison Complex (ASPC)-Yuma, Cheyenne Unit in San Luis, Arizona (Doc. 1 at 1).[1]  He sued former ADC Director Dora Schriro, Warden Jerry Sterns, and Deputy Warden James Franco (id.).[2]

Plaintiff is a Wiccan, and in his Complaint he alleged that Defendants' "religious

---

[1] Plaintiff has since been transferred to the ASPC-Yuma, Cibola Unit in San Luis, Arizona (Doc. 41).

[2] Upon screening, the Court dismissed Senior Chaplain Webster as a Defendant (Doc. 3). Defendant Chaplain William Whittenberger was dismissed for failure to serve (Doc. 23).

discrimination and favoritism" violated his Fourteenth Amendment equal protection rights (id. at 3; Doc. 58, Ex. 3, Pl. Decl. ¶ 3). Plaintiff claimed that the ADC policy governing inmates' religious activities—Department Order (DO) 904—provides Native American inmates dedicated land upon which to perform their religious ceremonies and these ceremonies may not be interrupted except for legitimate security concerns (Doc. 1 at 3). He alleged that this policy discriminates against non-Native Americans because his religious group is required to hold its ceremonies in an open recreation yard with no privacy and his group's religious services are frequently interrupted by detention officers (id.). Plaintiff averred that this difference in treatment is based on a policy established by Schriro and, although they have the power to do so, neither Sterns nor Franco made any effort to correct the discriminatory practice through the issuance of Institutional Orders (id.). Plaintiff sued for money damages and injunctive relief (id. at 6).

## II. Pending Motions

Defendants move for summary judgment on the grounds that (1) Schriro did not enact the challenged portion of DO 904 as it was part of the policy before her tenure; (2) there is no evidence of any discriminatory policy or practices related to Native American Sweat Lodge ceremonies versus the Multi-faith gatherings that Plaintiff participated in; and (3) Sterns and Franco have no authority to enact Institutional Orders (Doc. 44). In support of their motion, Defendants submit a separate Statement of Facts (DSOF) and various exhibits, including a copy of DO 904, numerous declarations, copies of grievances, and depositions excerpts (Doc. 45, Exs. 3-13).

Plaintiff opposes Defendants' motion (Doc. 57).[3] He submits his own separate Statement of Facts (PSOF),[4] which is supported by deposition excerpts, declarations, and

---

[3] The Court issued a Notice, required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), informing Plaintiff of his obligation to respond to Defendants' motion (Doc. 46).

[4] The Court rejects Defendants' argument that because PSOF does not include corresponding numbered paragraphs opposing each of one of their paragraphs, their entire DSOF should be deemed admitted (Doc. 59 at 1-2). PSOF clearly establishes disputes with DSOF; thus, in light of Plaintiff's pro se status, the Court will consider his PSOF. See

1  copies of grievance documents (Doc. 58, Exs. 2-8).

2  Meanwhile, Plaintiff moves for injunctive relief in the form of an order directing the
3  ADC to transfer funds from Plaintiff's retention account to his spendable account so that he
4  may access the funds to pay legal expenses (Doc. 47).

5  **III.   Defendants' Motion for Summary Judgment**

6  **A.   Legal Standards**

7  **1. Summary Judgment**

8  A court must grant summary judgment "if the movant shows that there is no genuine
9  dispute as to any material fact and the movant is entitled to judgment as a matter of law."
10 Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under
11 summary judgment practice, the movant bears the initial responsibility of presenting the basis
12 for its motion and identifying those portions of the record, together with affidavits, that it
13 believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S.
14 at 323.

15 If the movant meets its initial responsibility, the burden then shifts to the nonmovant
16 to demonstrate the existence of a factual dispute and that the fact in contention is material,
17 i.e., a fact that might affect the outcome of the suit under the governing law, and that the
18 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for
19 the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton
20 Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need
21 not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v.
22 Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific
23 facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v.
24 Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted).

25 At summary judgment, the judge's function is not to weigh the evidence and
26 determine the truth, but to determine whether there is a genuine issue for trial. Anderson,

27 ─────────
28 Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts should avoid applying summary judgment rules strictly against pro se inmates).

- 3 -

1  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw
2  all inferences in the nonmovant's favor.  Id. at 255.

### 2. Equal Protection

The Fourteenth Amendment Equal Protection Clause requires the State to treat all similarly situated people equally and entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (internal quotation omitted).  To show a violation under the Equal Protection Clause, a plaintiff must demonstrate that the defendant acted with a discriminatory intent or purpose that was based upon the plaintiff's membership in a protected class. Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).  A prisoner cannot prevail on an equal protection claim "if the difference between the defendants' treatment of him and their treatment of [other religious] inmates is 'reasonably related to legitimate penological interest.'" Shakur, 514 F.3d at 891 (internal quotation omitted); see Turner v. Safley, 482 U.S. 78, 89-90 (1987).

### B.     Analysis

#### 1. Schriro

The Court finds unavailing Defendants' argument that Schriro cannot be liable for an alleged unlawful ADC policy because she did not originally enact the policy.  That she maintained and carried out the policy is sufficient to establish liability if that policy caused a constitutional deprivation (see Doc. 45, DSOF ¶¶ 36-37). See al-Kidd v. Ashcroft, 580 F.3d 949, 965 (9th Cir. 2009); Coronel v. Paul, 225 Fed. Appx. 575, at *1 (9th Cir. 2007) (unpublished) (even though prison regulation at issue was already in place before the defendants worked at the facility, they oversaw and carried out the regulation and were therefore subject to supervisory liability based on personal participation) (cited pursuant to Ninth Circuit Rule 36-3).

#### 2. Department Order 904

Department Order 904 governs both Multi-faith services and Native American Sweat Lodge ceremonies (Doc. 45, DSOF ¶¶ 6-7; Doc. 58, PSOF ¶ 5).  Multi-faith gatherings

involve several different religious groups and their services are held once a week on the recreation field. Each religious group meets in a separate area within the space designated for the Multi-faith gatherings (DSOF ¶¶ 9-11; PSOF ¶¶ 6-7). The recreation field at the Cheyenne Unit is in the center of the housing units and is a large area—it contains a softball field, basketball court, and circuit training course (PSOF ¶ 8; DSOF ¶ 14).

Sweat Lodge ceremonies are held once a month (DSOF ¶ 23). The sweat lodge is located in a separate, designated location for safety and fire management reasons because the ceremony involves building a fire and using heated rocks (id. ¶¶ 25-26). The sweat lodge must be purified, and if a non-Native American enters, the sweat lodge cannot be used again until purification is redone (id. ¶ 28). Therefore, if there is a security concern during a Sweat Lodge ceremony, instead of entering the lodge, staff members have inmate-participants vacate the area (id.). But under certain circumstances, such as an assault of an inmate, staff will enter the sweat lodge when necessary (id. ¶ 29).

There is a provision within DO 904 providing that Sweat Lodge ceremonies "shall not be interrupted except for legitimate security concerns" (Doc. 45, Ex. 3, DO 904.04 § 1.4.1) The provisions specific to Multi-faith gatherings do not include the same language limiting interruptions to legitimate security concerns (id. §§ 1.4.2-1.4.4). Also, under DO 904, at any prison facility with a sufficient number of Native American inmates, there must be a separate site on which to construct a sweat lodge (id. § 1.4.1.1). The locations for Multi-faith gatherings are arranged through the prison Chaplain and other officials and are usually limited to the recreational areas (id. § 1.4.2; DSOF ¶ 9).

There is no question that these provisions treat Native American inmates differently from similarly situated inmates of other faiths, like Plaintiff. Defendants contend that the difference in treatment is due to past problems specific to Sweat Lodge ceremonies and legitimate safety and security concerns (Doc. 44 at 3-5). They proffer the declaration of Michael Linderman, the ADC Pastoral Administrator, who explains that the specific language concerning interruption of Sweat Lodge ceremonies was added to DO 904 because previously there were more interruptions to Sweat Lodge ceremonies solely due to the

- 5 -

1  restricted view into the lodge structure (Doc. 45, Ex. 6, Linderman Decl. ¶ 21). Thus, the
2  specific language in the policy resulted from ADC's attempt to correct problems with
3  unnecessary interruptions of Sweat Lodge ceremonies. This was a reasonable response by
4  ADC and served the legitimate objective of ensuring Native American inmates' free exercise
5  rights while maintaining security needs. See Cutter v. Wilkinson, 544 U.S. 709, 722, 725
6  n. 13 (2005) (prison security is a compelling state interest, and accommodation of religious
7  activities should not be elevated over security needs); Hudson v. Palmer, 468 U.S. 517, 523
8  (1984) ("[p]risoners must be provided 'reasonable opportunities' to exercise their religious
9  freedom").

10  Defendants also describe how the locations for the Sweat Lodge ceremonies and for
11 the Multi-faith gatherings ensure safety and security (Doc. 45, Ex. 6, Linderman Decl. ¶¶ 15-
12 16). As mentioned, fire management needs require a separate, isolated location for the sweat
13 lodge (id.). In his declaration, Franco states that the perimeter of the sweat lodge is small
14 enough that staff can monitor most activities without entering it, but due to the size of the
15 recreation field, staff must monitor the Multi-faith gatherings from within and they approach
16 a group only if a security concern arises (id., Ex. 8, Franco Decl. ¶¶ 11, 13). Franco explains
17 that although inmates are searched when they enter the recreation field, given the location
18 of the field, it is possible for inmates who are not participating in the Multi-faith gathering
19 to pass items through the fence that surrounds the field to inmates inside after they have been
20 searched (id. ¶ 10). This evidence establishes that the differences in monitoring of the Sweat
21 Lodge ceremonies and Multi-faith gatherings is reasonably related to the attending security
22 concerns. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (courts "must accord
23 substantial deference to the professional judgment of prison administrators, who bear a
24 significant responsibility for defining the legitimate goals of a corrections system and for
25 determining the most appropriate means to accomplish them"). In addition, Defendants
26 assert that no religious services—of any faith—are to be interrupted unless there is a
27 legitimate security concern, and any religious service may be interrupted if necessary for
28 security reasons (id., Ex. 5, Schriro Decl. ¶ 11; Ex. 6, Linderman Decl. ¶ 21).

Plaintiff does not challenge the purpose for the language in DO 904 precluding interruptions of Sweat Lodge ceremonies, nor does he dispute that the separate location of the sweat lodge serves fire management and safety needs or that there is a security risk present during Multi-faith gatherings (see Doc. 58, PSOF).  Instead, Plaintiff argues that—as to the provisions governing Multi-faith gatherings—the lack of any specific language precluding interruptions absent a legitimate security concern has led to intrusions by ADC staff for minor violations or for no legitimate security reason (Doc. 57 at 4).  He identifies two specific instances when ADC staff interrupted his religious services: (1) in August 2007, a ceremony was interrupted so staff could confiscate a contraband hair spray bottle; and (2) on February 4, 2009, staff broke up a holy day celebration at about 7:00 p.m. and ordered Plaintiff and other inmates back to their housing units despite a memorandum the inmates held showing written authorization from Franco to conduct the ceremony up to 7:30 p.m. (Doc. 58, Ex. 2, Pl. Dep. 23:12-25:11, June 30, 2010).  Plaintiff also testifies that there were regular minor intrusions, such as officers stepping in to monitor grooming regulations (id., Pl. Dep. 24-26).  He proffers the sworn statements of two other prisoners who describe similar interruptions to their Multi-faith religious services for reasons such as officers did not know what the inmates were doing and inmates were being too loud (Doc. 58, Ex. 4, Balsursson Decl. ¶¶ 4-7; Ex. 5, Esparza Decl. ¶¶ 3-7).

Defendants submit sufficient evidence to demonstrate that the August 2007 interruption was pursuant to a legitimate security concern (Doc. 45, Exs. 10-11).  Moreover, in his deposition, Plaintiff admitted that the hair spray bottle was contraband (Doc. 58, Ex. 2, Pl. Dep. 23:3-4).  Defendants acknowledge and do not explain the February 2009 early termination of services by ADC staff, but there is no evidence that this isolated action was due to a discriminatory policy or intent.  See Serrano, 345 F.3d at 1082; see also Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 265 (1977) (proof of discriminatory intent or motive is necessary to show a violation of the Equal Protection Clause).  Standing alone, Plaintiff's allegation that "Defendants clearly acted with purpose and intent to discriminate against all Arizona inmates who are not Native American Sweat

1  Lodge participants" is insufficient to create an issue of material fact (Doc. 57 at 6). See
2  Taylor v. List, 880 F.2d 1040, 1045-46 (9th Cir. 1989) (conclusory allegations insufficient
3  to defeat summary judgment).

4        With respect to the other interruptions by staff, Plaintiff testified that they were
5  "minor interruptions. You know, nothing major," and that "none of these are really highly
6  intrusive[.]" (Doc. 58, Ex. 2, Pl. Dep. 25:14-15, 26:20-21). There is no evidence that these
7  interruptions stemmed from a purposeful intent to discriminate against Plaintiff because of
8  his religion. See Village of Arlington Heights, 429 U.S. at 265. Nor is there any evidence
9  to show that Native American inmates do not experience comparable interruptions or
10 difficulties when practicing their religion. See McCollum v. California, 610 F. Supp. 2d
11 1053, 1057-58 (N.D. Cal. 2009) (refusing to accept Wiccan Chaplain's assumption that
12 difficulties he encountered were not common to all volunteer clergy). Plaintiff has
13 established only that the minor interruptions result in some inconvenience and lack of privacy
14 (see Doc. 58, Ex. 3, Pl. Decl. ¶¶ 13, 15), which is significantly different from the
15 consequences of a sweat lodge intrusion that terminates the Sweat Lodge ceremony and
16 requires purification of the lodge before it can be used again (Doc. 45, Ex. 6, Linderman
17 Decl. ¶ 19).

18       Plaintiff also fails to allege that ADC's policy prevents him from practicing his
19 religion. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987) (that prisoners were
20 not deprived of "all means of expression," but could participate in other religious
21 observances, supported the conclusion that the restrictions at issue were reasonable); Turner,
22 482 U.S. at 92. Indeed, he specifically testified that the policy has not denied him a
23 reasonable opportunity to exercise his faith (Doc. 58, Ex. 2, Pl. Dep. 34:2-6). Plaintiff seeks
24 to have a separate ritual area for Wiccan celebrations (Doc. 58, Ex. 3, Pl. Decl. ¶¶ 6, 10-11).[5]

---

26       [5]Plaintiff also cites to the Religious Land Use and Institutionalized Persons Act
27 (RLUIPA), 42 U.S.C. § 2000cc(a)(1), to support his claim for a separate ritual space for
   Wiccan ceremonies (Doc. 57 at 5). Plaintiff did not raise a RLUIPA claim in his Complaint,
28 and he presents nothing to show that ADC's policy amounts to a zoning regulation subject
   to RLUIPA or that it imposes a substantial burden on his religious exercise. See 42 U.S.C.

1  Prisons are not required to provide identical facilities and resources to different faiths. They
2  need only make a "good faith accommodation of the [prisoners'] rights in light of practical
3  considerations." Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987) (citation omitted); see
4  Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972). Defendants proffer evidence that ADC's
5  Religious Advisory Committee—private citizens who advise ADC of the requirements to
6  fulfill the practice of each religion—includes a Wiccan member, and this Committee has
7  never advised that a separate area is necessary for Wiccan practices (Doc. 45, Ex. 6,
8  Linderman Decl. ¶¶ 22-24). Plaintiff does not respond to this evidence. In short, the fact
9  that DO 904 affords Native American inmates separate, designated land for ceremonies but
10  does not provide the same for Wiccan inmates does not amount to an equal protection
11  violation because Plaintiff retains a reasonable opportunity to practice his religion.

12  Defendants have established that the difference between ADC's treatment of Plaintiff
13  and its treatment of Native American inmates—in terms of policy regulations governing
14  interruptions of services and space provided for services—is reasonably related to legitimate
15  penological interests. See Shakur, 514 F.3d at 891. Further, there is no evidence of
16  discriminatory intent. Plaintiff has failed to present specific facts or evidence to demonstrate
17  that a material factual dispute exists. Summary judgment is therefore warranted on Plaintiff's
18  equal protection claim against Schriro based on DO 904.

### 3. Sterns and Franco

20  In light of the determination that DO 904 does not violate Plaintiff's equal protection
21  rights, Sterns and Franco cannot be liable for failing to issue an Institutional Order to amend
22  the policy, even if they had the authority to do so. Accordingly, they are entitled to summary
23  judgment.

### IV.   Plaintiff's Motion for Order to Transfer Retention Funds

25  Because this order grants summary judgment to Defendants and terminates the action,
26  Plaintiff's request for injunctive relief is moot.

---

§ 2000cc(a)(1).

**IT IS ORDERED:**

(1) The reference is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 44) and Plaintiff's Motion for Order to Transfer Retention Funds (Doc. 47).

(2) Defendants' Motion for Summary Judgment (Doc. 44) is **granted**.

(3) Plaintiff's Motion for Order to Transfer Retention Funds (Doc. 47) is **denied** as moot.

(4) The Clerk of Court must terminate this action and enter judgment accordingly.

DATED this 23rd day of May, 2011.

*David G. Campbell*
United States District Judge